# Third District Court of Appeal

## State of Florida

Opinion filed April 12, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D08-1518
Lower Tribunal No. 04-2111B

_____

**Manuel Walters,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Julio E. Jimenez, Judge.

Carlos J. Martinez, Public Defender, and Brian L. Ellison, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Linda S. Katz, Assistant Attorney General, for appellee.

Before ROTHENBERG, LOGUE,* and SCALES, JJ.

_____

* Judge Logue did not participate in oral arguments.

ROTHENBERG, J.

On March 17, 2010, this Court affirmed Manuel Walters' ("the defendant") conviction for second degree murder. Walters v. State, 30 So. 3d 656 (Fla. 3d DCA 2010). Subsequent to this Court's mandate, the Florida Supreme Court issued its opinion in State v. Montgomery, 39 So. 3d 252 (Fla. 2010), wherein the Florida Supreme Court held that it constitutes fundamental error when a defendant has been convicted of second degree murder and the jury was given an erroneous manslaughter by act instruction. Three years after Montgomery, the Florida Supreme Court issued its opinion in Haygood v. State, 109 So. 3d 735, 741 (Fla. 2013). In Haygood, the Florida Supreme Court held that:

> [G]iving the manslaughter by culpable negligence instruction does not cure the fundamental error in giving the erroneous manslaughter by act instruction where the defendant is convicted of second-degree murder and the evidence supports a finding of manslaughter by act, **but does not reasonably support a finding that the death occurred due to the culpable negligence of the defendant**.

Id. (emphasis added).

The defendant in the instant case was convicted of second degree murder, the jury received the erroneous manslaughter by act instruction, and the jury was also instructed as to culpable negligence as a lesser included offense of second degree murder. Thus, the Florida Supreme Court remanded Walters v. State back to this Court for reconsideration based on its decision in Haygood. Because defense counsel in the instant case clearly and repeatedly argued a theory upon

2

which the jury could have found the defendant guilty of manslaughter by culpable negligence, and the evidence reasonably could have supported a finding of culpable negligence, affirmance is mandated in this case based on both Haygood and this Court's opinion in Dawkins v. State, 170 So. 3d 81 (Fla. 3d DCA 2015). Accordingly, we affirm the defendant's conviction and sentence.

## ANALYSIS

In Dawkins, this Court, on rehearing and/or clarification, re-evaluated Dawkins' petition for writ of habeas corpus based on the Florida Supreme Court's holding in Haygood. After citing to the Florida Supreme Court's holding, this Court held:

> Upon review of the record in Dawkins' case, there was conflicting testimony regarding intent, and although Dawkins did not rely on a culpable negligence defense, the record shows there existed, in all of the disputed evidence below, some evidence from which the jury reasonably could have found Dawkins guilty of manslaughter by culpable negligence, in contrast to the facts in *Haygood*. With that in mind, where the jury was also instructed [on] manslaughter by culpable negligence *and the evidence could reasonably support so finding*, the error in giving the flawed *Montgomery* manslaughter by act instructions was not per se fundamental error.

Dawkins, 170 So. 3d at 82 (citations omitted) (emphasis in the original).

Thus, based on Haygood and Dawkins, this Court must examine the entire record to determine if: (1) there was conflicting evidence as to the defendant's intent; and (2) if there was conflicting evidence as to the defendant's intent, whether there was some evidence from which the jury reasonably could have

3

found the defendant guilty of manslaughter by culpable negligence. As will be documented below, there is more than ample evidence from which a jury could have concluded that the victim was shot and killed due to the culpable negligence of the defendant.

A. **Culpable negligence**

The culpable negligence instruction states as follows:

Each of us has a duty to act reasonably towards others. If there is a violation of that duty, without any conscious intention to harm, that violation is negligence. But culpable negligence is more than a failure to use ordinary care toward others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard for the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.

The negligent act or omission must have been committed with an utter disregard for the safety of others. Culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known, or reasonably should have known, was likely to cause death or great bodily injury.

Fla. Std. Jury Instr. (Crim.) 7.7.

B. **The defendant's intent was a disputed issue at trial**

As the defendant candidly admits in his reply brief filed with this Court on May 28, 2015, the defendant's intent was a disputed issue of fact at trial.

Mr. Walters never so much as suggested that he intended to kill the

4

victim, and the State agreed that it needed to prove that element. Defense counsel only proposed that the evidence raised a reasonable doubt because it was consistent with an unintentional killing during a struggle.

Reply Brief of Appellant, page 1 (record citations omitted).

A complete review of the trial transcript reveals that throughout the trial, including cross-examination of the witnesses and his arguments to the jury, defense counsel confronted and disputed the State's theory of the case. The State's theory of the case was that the defendant accidentally discharged his own firearm inside of a car he was in with his co-defendant, Joseph Long ("Long"), and because the defendant was intoxicated, he mistakenly believed someone had shot at them. The defendant then exited the car, confronted the victim, who was seated in a car with the door closed and the windows up, struck the driver's side window of the victim's car with his firearm at least two times, and then shot the victim through one of the holes he had created in the window.

The State argued that although no one actually saw the defendant shoot the victim, the evidence established beyond a reasonable doubt that when the defendant exited the vehicle, he banged on the victim's window with a firearm and then shot the victim through a hole in the window, and that he did so with evil intent and a depraved mind, constituting the crime of second degree murder. In contrast, defense counsel argued that they did not know what happened that night and the State's case was built upon conjecture and speculation. For example,

5

defense counsel argued:

> We have no idea why it happened, none. You can speculate from here to eternity and on the evidence here in this small little room in which the [fate] of another human being will be determined, no evidence of why it happened has been brought before you.
>
> . . . .
>
> The problem with this case is [that] we don't know what happened because you cannot solve the lack of evidence in this case with basically speculating about what may have happened.

Defense counsel argued that the evidence was also consistent with someone shooting at the defendant while he was seated in a vehicle; the defendant exiting his vehicle; the defendant struggling with the victim, who was armed with a firearm; and while the defendant was attempting to disarm the victim, the gun discharging, fatally wounding the victim. Because no one actually saw the shooting, defense counsel argued that, not only was the evidence consistent with an accidental discharge of the firearm during a struggle between the defendant and the victim, but such a view of the evidence was more plausible than the State's theory of the case—that the defendant banged on the victim's car window with a firearm and then shot the victim with evil intent and a depraved mind.

C. **The disputed evidence of the defendant's intent**

The State's theory of the case was that the events that resulted in the victim's death began when the defendant accidentally discharged his firearm in his car. Because the defendant mistakenly believed someone had fired at him and

6

Long, the defendant exited the car, found the victim sitting in the victim's car, banged on the victim's car window with his firearm, and shot the victim through one of the holes he had made in the window. The defendant and Long then drove to a gas station while being pursued by the police, ran inside the store where the defendant hid the firearm, and he and Long were ultimately arrested. Long was taken into custody without incident at the gas station, and the defendant, who fled, was found hiding in a shed and had to be tased in order to be taken into custody.

In support of its theory of the case, the State presented various witnesses including police officers, Long, and several technical witnesses including a crime technician specializing in gunshot residue, a firearm tool mark examiner, a ballistics expert, a DNA analyst, and a medical examiner. The first witness, Jennifer Wing, a K-9 officer for the Miami-Dade Police Department, testified that she was seated in her vehicle approximately one block away from the shooting, which occurred after 10:00 p.m. She testified that she heard a gunshot, looked towards the direction of the gunshot, and saw a dark colored car parked in the roadway. Right next to the passenger door, which was closed, she saw a silhouette "kind of bobbing and weaving like a boxer would do and then [she] saw an arm extend up" and then she heard another gunshot. After the second gunshot, Officer Wing saw an individual open the passenger door and get into what was later determined to be a green Honda, and the green Honda proceeded in her direction.

7

She described the driver of the green Honda as a black male (later identified as the co-defendant Long) and the passenger of the green Honda as a white Latin male (later determined to be the defendant). Officer Wing noted the tag number, called it in, asked for police assistance, and followed the Honda to a gas station, where she saw the occupants bail out of the car and run into the convenience store. When the defendant exited the store, Officer Wing confronted him. The defendant fled and he was eventually apprehended by other officers, who found him hiding in a shed.

Through the testimony of the lead detective, crime scene technician, criminalists, a forensic biologist, a firearm tool mark examiner, and the medical examiner, the jury learned that the lead detective arrived within nine minutes of Officer Wing's call for assistance. The victim's vehicle, a white Ford, was found on the swale at 1115 N.W. 38th Street, the scene of the shooting. The victim was found behind a house, unresponsive and bleeding from a gunshot wound that had entered his chest and exited his back. He also had cuts on his left hand. The victim's white Ford's bumper was dented, the front driver's side headlight was missing, and glass from the broken headlight was found on the sidewalk. The victim's blood was found on the driver's side doorjamb of his vehicle and on his wallet, which was also found in his vehicle. No blood was found on the street, sidewalk, or swale. The only blood found at the shooting scene outside of the

victim's vehicle was the blood found behind the house where the victim had collapsed. The driver's side window of the victim's vehicle was broken in two distinct places and a projectile was found lodged inside the passenger seat of the victim's vehicle.

An examination of the green Honda the defendant was in revealed a bullet hole in the lower portion of the front passenger window. The crime scene technician testified that the bullet hole was caused by a bullet shot from inside the vehicle and exiting outside of the vehicle. A "copius" amount of gunshot primer particles was found in the green Honda, consistent with the firearm having been discharged **in** the vehicle.

Surveillance footage from inside the convenience store showed the defendant pulling something out of his waistband. The murder weapon, a .357 Magnum, was recovered from the convenience store the defendant and Long had fled into after the shooting. The firearm was loaded with four live rounds and two spent casings. The projectile that entered the victim's chest and exited his back was recovered from the passenger seat of the victim's vehicle. The testimony presented at trial reflects that the recovered projectile was fired by the .357 Magnum. The barrel of the firearm also had scratches consistent with the barrel having struck an object, which the State argued was made when the defendant struck the victim's car window with the firearm. When the defendant was taken

9

into custody, he had cuts on his hand. DNA testing revealed that the drops of blood found outside and inside the convenience store were the defendant's blood. A shard of glass, which was found stuck between the grip and the trigger guard of the gun, was determined to have come from the broken driver's side window of the victim's vehicle. From the two different DNA findings on the murder weapon, the crime lab forensic biologist was able to conclusively rule out the victim and Long as possible contributors, but she was not able to either rule out the defendant as a contributor or testify that, within a reasonable degree of scientific probability, the defendant's DNA was on the weapon. She could only testify that the defendant was a possible contributor of the DNA found on the murder weapon.

Lastly, the State called the co-defendant, Long, as a witness. Long testified that the defendant picked him up that evening in the green Honda and that they drove to a music studio. Thereafter, the defendant asked Long to drive because the defendant told Long "he was kind of messed up" and he did not have a valid driver's license. Long began driving. While they were stopped at a stop sign, Long saw someone walking on a sidewalk towards them, saw the defendant swinging his arm towards the rear window, and heard a loud bang. Long hit the brakes, and while Long was looking around the car to see if anything had been broken, the defendant jumped out of the car. When he next saw the defendant, the defendant was standing outside of a white car. He saw the defendant strike the

window of the white car with something in his hand, and while the defendant was about to strike the window again, he heard another "bang go off." The defendant jumped back into the green Honda with Long driving. Long stopped at a gas station and surrendered to the police.

The record reflects that throughout the trial, defense counsel attempted to discredit both the State's theory and the evidence that the defendant intentionally, and with malice, ill-will, or evil intent shot and killed the victim. Instead, defense counsel attempted to convince the jury that either the victim had shot at the defendant or the defendant mistakenly believed that the victim shot at him, the defendant exited his vehicle and confronted the victim, and the gun accidentally discharged while the defendant was trying to defend himself as he was struggling with the victim over the gun.

Thus, defense counsel focused on the defendant's lack of malice, ill-will, or intent. Beginning with his opening statement, defense counsel told the jury that the evidence that would be presented during the trial would be more consistent with the defense's theory that the defendant was attacked by the victim first when the victim shot at him, and then the defendant confronted the victim and the firearm discharged while the defendant and victim were struggling over the firearm, rather than the State's theory of the case that the defendant had intentionally and with malice, ill-will, or evil intent shot and killed the victim. For example, defense

counsel stated the following:

> There are two holes in the window [of the victim's car]. And the evidence will show that those two holes may very well have been caused by being hit with a gun or by fists. And the evidence will also show that it is consistent with two people struggling for a gun, slamming against the window and breaking it. And the fact that those knuckles and the knuckles that are cut are Mr. Walters, the evidence is consistent and will show that Mr. Walters had his hands over the hands of the individual who was trying to shoot him, who is the deceased in this case. And that's why his knuckles are the ones that are cut and not the victim's.

Defense counsel actively pursued this defense through the cross-examination of the State's witnesses. For example, when defense counsel cross-examined Officer Wing, he established that she was approximately one block away from where the shooting occurred, she did not see a muzzle flash or how the shooting occurred. Gunshot residue was found: (1) inside the green Honda the defendant was in; (2) on the palm and back of the victim's left hand but not on the victim's right hand (the victim was right-handed); (3) on the palm of the defendant's right hand; and (4) on the palm and back of the defendant's left hand. When defense counsel cross-examined Alan Kline, the criminalist who testified about the gunshot residue, he asked Kline whether, based on his examination of the gunshot residue, it was possible that the defendant and the victim had struggled over the gun and the gun had discharged during the struggle. Kline agreed that it was possible. Defense counsel was also able to establish that gunshot residue may be rubbed off or transferred during contact and that fire rescue and medical personnel may have

12

disturbed gunshot residue on the victim's hands while trying to save the victim's life.

Through the medical examiner, defense counsel was able to obtain expert testimony that the evidence, including the trajectory of the projectile that entered and exited the victim's body and was found lodged in the passenger seat of the victim's vehicle, was consistent with a struggle outside of the car, the gun discharging during the struggle, and the bullet traveling through the victim's chest through the open car door, and into the passenger seat of the victim's vehicle. Additionally, in support of the defendant's defense that the defendant was not armed that evening and that the victim was the initial aggressor who fired a shot at the defendant, followed by a struggle over the gun in the defendant's attempt to disarm the victim, and the gun discharging during that struggle, defense counsel elicited testimony from the co-defendant, Long, that he never saw the defendant in possession of a firearm that night and that he could not tell whether the first shot was due to the discharge of a firearm inside the car that he and the defendant were in or due to someone shooting at them.

Lastly, during closing arguments, defense counsel argued that the State had failed to prove how the shooting occurred. He argued that the evidence was inconsistent with the State's theory of the case, and he attacked the credibility of and the conclusions reached by some of the State's witnesses. He then highlighted

the testimony by the medical examiner, who admitted that the victim could have been shot during a struggle, and argued that it was more plausible that the victim was shot while the defendant was attempting to disarm the victim, who was trying to shoot the defendant.

> Well, as plausible, as, much more plausible than one of the theories of the prosecution is that Mr. Walters was trying to disarm[] the individual [who] was trying to shoot him. And that he puts his right hand over the hand of the man who had the gun. And as they struggled for the gun, of course, the man who had the gun has the gun, has his hand under the hand . . . that covers him. And that during that bobbing and weaving[,] that . . . struggle that gun crashes two or three times against the window breaking it, then, of course, Mr. Walters['] hand would be cut. But the hand of the individual who's holding the gun is shielded by the man's hand. . . .
> . . . .
>
> Contrary to what the State stated during its first part of closing summation there were injuries that were very much indicated during my question that there might have been a struggle or that could have been a struggle. The doctor described that there was a cut [on] [the victim's] nose which the State theorizes could have been from a piece of glass, that's a theory. It is consistent with a piece of glass, consistent means it could have happened, that what it means. But there's also contusions[,] he had abrasions [on] one of his knees and he had another contusion on his body.
>
> So therefore that is also consistent with injuries in a struggle absolutely. . . .

Thus, it is clear that defense counsel actively pursued a theory that when the defendant shot the victim it was without malice or evil intent.

C. **The record contains evidence upon which the jury could have found the defendant guilty of culpable negligence**

The undisputed evidence was that the defendant was "messed up" that evening. The jury could have found the defendant guilty of manslaughter by culpable negligence if the jury concluded that (1) the defendant, in his intoxicated state, accidentally discharged his own firearm in the green Honda, (2) in his stupor, the defendant believed someone had fired at him while he was seated in the Honda, (3) the defendant exited the Honda to confront the victim, who he believed may have shot at him, banged on the window of the vehicle the victim was in with a firearm, and (4) the firearm either discharged while the defendant was banging on the window, or while he and the victim were struggling over the gun.

Culpable negligence is the failure to act reasonably towards others without any conscious intention to harm. It is reckless conduct—a negligent act or acts committed with an utter disregard for the safety of others. There was evidence upon which the jury could have found that the defendant's acts were gross and flagrant, demonstrating a disregard for human life or the safety of persons exposed to his acts—that he consciously committed an act or acts or followed a course of conduct that the defendant must have known or reasonably should have known was likely to cause death or great bodily harm.

If the jury did not believe that the State had proved beyond a reasonable doubt that when the defendant shot the victim he did so intentionally and with ill-will, hatred, spite or evil intent, then it could have found that the defendant did so

while acting with gross and flagrant recklessness.  Carrying a loaded firearm on his person while in such an intoxicated state that he was unable to discern whether he had accidentally discharged his own firearm while seated in a car with another individual or he was being fired upon by someone outside of the car was certainly gross, flagrant, and reckless behavior, demonstrating a total disregard for the safety of the other occupant (Long who was driving the car) and the general public.  But neither Long nor members of the general public were killed as a result of the negligent discharge of the defendant's firearm in the green Honda.  It was the defendant's subsequent acts that resulted in the death of the victim.  The jury could have concluded that because of his mistaken belief that someone had fired a gun at him, the defendant confronted an innocent and unarmed man with his firearm.  In his stupor and rage, the defendant banged on the window of the vehicle the victim was in with that firearm, and the firearm discharged, killing the victim.  Thus, if the jury was not convinced that the defendant was guilty of second degree murder, it could have found the defendant guilty of manslaughter by culpable negligence.

Because there was evidence from which the jury could have found the defendant guilty of manslaughter by culpable negligence, this Court must affirm the defendant's conviction based on this Court's decision in <u>Dawkins</u> and the Florida Supreme Court's decision in <u>Haygood</u>.  In <u>Dawkins</u>, this Court specifically relied on <u>Haygood</u> in denying Dawkins' petition for writ of habeas corpus based on

16

the erroneous manslaughter by act instruction given to the jury. In finding that no fundamental error had occurred, this Court held that, although Dawkins did not rely on a culpable negligence defense, there was evidence upon which the jury could have found Dawkins guilty of manslaughter by culpable negligence. The same is true in this case.

## **CONCLUSION**

The issue before this Court on remand is whether the unobjected-to erroneous manslaughter by act jury instruction is fundamental error where the defendant was convicted of second degree murder and the jury was also instructed on manslaughter by culpable negligence as a lesser included offense of second degree murder. Because the record clearly reflects that the defendant's intent was a disputed issue at trial and there was evidence upon which the jury could have found that the firearm accidentally discharged and killed the victim due to the culpable negligence of the defendant, the giving of the flawed manslaughter by act instruction does not constitute fundamental error in this case. Accordingly, we affirm.

Affirmed.

17